# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 14-CR-94-CJW-MAR |
| vs. | |
| MATTHEW JAMES MCCAULEY, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

## I.    INTRODUCTION

This matter is before the Court on defendant's Motion for Compassionate Release filed on June 9, 2020.  (Docs. 71 & 72).  On June 15, 2020, the government timely filed a brief in resistance.  (Doc. 73).  On June 22, 2020, defendant timely filed a reply.  (Doc. 77).  Oral argument was not requested and is not necessary.  *See* LR 7(c).  For the following reasons, the Court **denies** defendant's motion.

## II.    RELEVANT BACKGROUND

In February 2014, defendant opened a store called the Fragrance Hut in Cedar Rapids, Iowa.  (Doc. 32, at 5).  The purpose of the store was to sell synthetic cannabinoids which included products containing controlled substances or analogue controlled substances.[1]  (*Id.*).  On March 11, 2014, officers found a bag containing 63 synthetic cannabinoids during a traffic stop of a Fragrance Hut employee, who stated he was taking the products to his home at defendant's direction.  (*Id.*).  On March 20, 2014,

---

[1] The synthetic cannabinoids underlying defendant's offense were sold under a variety of brand names, such as iPhone, WTF, Joker, Joker II, Diablo, 7H, 7H Hydro, Down 2 Earth Climaxx, Fairly Legal, Smoking Santa, Green Giant, OMG, Purple Haze, Pure, Bizarro, Scooby Snax, Strawberry Daze, K.O., Caution, Mad Hatter, and Little Hot.  (Doc. 32, at 5–8, 10–12).

undercover officers purchased two synthetic cannabinoids from the Fragrance Hut. (*Id.*, at 6). On March 21, 2014, officers responded to a complaint at a hotel that defendant was acting strangely and destroying his room. (*Id.*, at 7). During a search of the room, officers found $1,245 and a fake ID with the name Jeff Hoffa but with defendant's photo. (*Id.*). During defendant's arrest on an outstanding warrant, officers searched a bag near defendant and discovered drug paraphernalia items, two baggies of methamphetamine, 47 oxycodone pills, 17 hydrocodone pills, and multiple synthetic cannabinoids. (*Id.*). On June 4, 2014, defendant was arrested on state offenses consisting of theft, possession of controlled substances, domestic abuse assault, unlawful possession of prescription drugs, and possession of drug paraphernalia. (*Id.*, at 8). Officers searched defendant's digital devices and found correspondence wherein defendant ordered at least 5,402.7 grams of synthetic cannabinoids from May 13, 2014, through June 4, 2014, and was also attempting to design his own synthetic cannabinoid product. (*Id.*). On July 18, 2014, officers conducted a traffic stop on a vehicle defendant was driving in which his employee was a passenger. (*Id.*, at 10). Officers searched the car and discovered a glass pipe, four containers of synthetic cannabinoids, an envelope containing $2,635, and bags of powder synthetic cannabinoids. (*Id.*). Defendant denied these items were his or that he tried to hide some of them in his employee's purse. (*Id.*). On August 8, 2014, officers were dispatched to the Fragrance Hut based on a report defendant and others were attempting to enter the building despite it being placarded by the city. (*Id.*, at 12). During defendant's arrest on an outstanding federal warrant and for occupying a placarded structure, officers discovered three packets of controlled substances or analogue controlled substances on his person.

On August 20, 2014, a grand jury issued an Indictment charging defendant with maintaining a drug-involved premises in violation of Title 21, United States Code, Section 856(a)(1). (Doc. 2). On August 22, 2014, defendant pleaded not guilty and was detained

pending trial. (Doc. 6). On August 26, 2014, Jeff Hoffa ("Hoffa") reported someone had opened a bank account and a line of credit in his name and used such credit at a jewelry store. (Doc. 32, at 13). Officers discovered defendant executed this scheme and did so knowing Hoffa was a real person and using Hoffa's real date of birth. (*Id.*). On September 26, 2014, the government issued an Information charging defendant with aggravated identity theft in violation of Title 18, United States Code, Section 1028A(a)(1). (Doc. 16). On September 29, 2014, defendant waived indictment on the identity theft offense. (Doc. 18). That same day, defendant changed his plea to guilty on Count 1 of the Indictment and pleaded guilty to Count 1 of the Information. (Doc. 20). On October 16, 2014, the Court accepted defendant's pleas. (Doc. 23).

On May 13, 2015, the United States Probation Office ("USPO") filed defendant's second revised final presentence investigation report ("PSR"). (Doc. 32). Defendant was, at that time, 39 years old and residing in Cedar Rapids, Iowa, where he had lived most of his life. (*Id.*, at 2, 28). He had some college education. (*Id.*, at 2). His parents divorced when he was an infant and he was primarily raised by his mother. (*Id.*, at 27). Defendant's father abused drugs and alcohol and introduced defendant to such substances when they reunited, at which time defendant was 12 years old. (*Id.*). Defendant had four children from a prior relationship who he frequently visited. (*Id.*, at 28). In 2009, defendant discovered he also had another teenage son. (*Id.*). Defendant married in 2011 but divorced the next year. (*Id.*). His work history was consistent and stable. (*Id.*, at 32). Defendant suffered from sleep apnea and severe insomnia. (*Id.*, at 28). He reported severe back arthritis and pain for which he took ibuprofen three times a day. (*Id.*, at 29). Defendant also reported arthritis in his knees. (*Id.*). He was on nine pain medications but was denied disability benefits for such pain. (*Id.*). Defendant was diagnosed with attention deficit hyperactivity disorder, social anxiety disorder, and obsessive-compulsive disorder. (*Id.*). Defendant noted some trauma from witnessing his stepfather become

paralyzed in a diving accident when he was a child. (*Id.*). Defendant described himself as a "severe alcoholic" and "severe" marijuana user. (*Id.*). He used methamphetamine daily for years as well as cocaine but had since stopped using cocaine "cold turkey." (*Id.*, at 30). He described himself as a "full blown [K2] addict," smoking "five bags or more per day." (*Id.*). Defendant had been addicted to pain killers for about four or five years. (*Id.*). Defendant had been in around a dozen drug treatment programs but never successfully completed any of them. (*Id.*, at 30–31).

Defendant also had an extensive criminal history, including convictions for nine thefts, assault, three trespasses, driving on a suspended license twice, burglary, possession of controlled substances on three occasions,[2] interference with official acts on four occasions,[3] vandalism, providing a false identification, public intoxication, harassment, criminal mischief, domestic abuse assault, two forgeries, and unlawful possession of a prescription drug. (Doc. 32, at 15–25). On multiple occasions, defendant violated the terms of his probation by failing drug tests, failing to participate in drug treatment, and failing to report to his probation officer. (*Id.*, at 17–18). Defendant's offenses often involved controlled substances, property damage, and violence against women.[4] (*Id.*, at 16, 18–22, 24).

On June 10, 2015, the Court sentenced defendant. (Doc. 37). The PSR found defendant was in criminal history category III with a total offense level of 30, yielding

---

[2] One of these convictions is listed as a violation of the drug tax stamp. (Doc. 32, at 18). The offense conduct reflects defendant had 137 grams of marijuana in his freezer. (*Id.*).

[3] One of these convictions involved witness or juror tampering. (Doc. 32, at 18).

[4] Defendant's convictions alone show he shoved a woman over a table, pushed a woman into a bedroom and broken the handle off the door, damaged a hotel during an argument with his girlfriend, assaulted his wife twice, violated a no contact order by his wife, harassed a woman via phone, and "smacked and choked" a woman. (Doc. 32, at 16, 18–22, 24).

4

an advisory guideline range of imprisonment of 121 to 151 months followed by a period of supervised release not to exceed three years on Count 1 of the Indictment and a one-year mandatory minimum consecutive sentence on Count 1 of the Information. (Doc. 32, at 35). Defendant moved for a downward variance based on the nature of synthetic cannabinoids, his background, and his addiction. (Doc. 34). The Court denied his motion and sentenced him to 134 months' imprisonment followed by three years on supervised release.[5] (Doc. 39). On June 23, 2015, defendant timely appealed his sentence. (Doc. 42). On November 10, 2015, the Eighth Circuit Court of Appeals affirmed defendant's sentence. (Doc. 54). Defendant is currently incarcerated at FMC Rochester with a projected release date of March 4, 2024. (Doc. 72, at 2).

## III. COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the [Bureau of Prisons] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The court may only reduce the defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

(i) extraordinary and compelling reasons warrant such a reduction; or

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the

---

[5] This is comprised of 110 months on Count 1 of the Indictment and 24 months on Count 1 of the Information to be served consecutively and a period of supervised release of three years on Count 1 of the Indictment and one year on Count 1 of the Information to be served concurrently. (Doc. 39).

offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [Bureau of Prisons] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

The starting point in determining what constitutes "extraordinary and compelling reasons" under Section 3582(c)(1)(A)(i) is the United States Sentencing Guidelines ("USSG") discussing compassionate release. *See* USSG §1B1.13; *see also United States v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). USSG Section 1B1.13 provides extraordinary and compelling reasons exist when the defendant is (1) suffering from a terminal illness; (2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physically or mentally deterioration due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover; (3) at least 65 years old, experiencing serious deterioration due to age, and has served at least 10 years or 75 percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's minor child or the incapacitation of the defendant's spouse who now requires the defendant's care; (5) some other extraordinary and compelling reason as determined by the Director of the Bureau of Prisons ("BOP").

Courts are split on whether the policy statement is binding because it predates the First Step Act of 2018's changes to Section 3582(c)(1)(A). *Compare United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019), *with United States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019).

6

This Court has concluded USSG Section 1B1.13, although it is a helpful guidepost, does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant. *See United States v. Burnside*, No. 6:18-CR-2068-CJW-MAR, 2020 WL 3443944, at *3–4 (N.D. Iowa June 18, 2020) (compiling cases).

## IV. DISCUSSION

### A. Exhaustion of Administrative Remedies

Section 3582(c)(1)(A) states the court may reduce a defendant's term of imprisonment after the defendant exhausts all administrative remedies within the BOP or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" This Court has held defendants are not required to administratively appeal a warden's denial and may fulfill the exhaustion requirement of Section 3582(c)(1)(A) by waiting 30 days from the date the warden receives their request before filing a motion in the courts. *See Burnside*, 2020 WL 3443944, at *4–7.

Here, defendant submitted his request to FMC Rochester's warden on April 17, 2020. (Doc. 72–1, at 2). It appears the warden never responded. On May 21, 2020, defendant emailed the warden to inquire about the status of his request and was told there was a backlog of requests. (*Id.*, at 1). Because 30 days have now elapsed since defendant submitted his request to the warden, the Court finds defendant has fulfilled the exhaustion requirement of Section 3582(c)(1)(A).

### B. Extraordinary and Compelling Reason

Defendant argues an extraordinary and compelling reason for release is present because his medical conditions put him at a high risk of severe complications and death if exposed to COVID-19. (Doc. 72, at 5–15). Defendant cites his chronic pain, sleep

7

apnea, chronic obstructive pulmonary disease ("COPD"),[6] and obesity. (*Id.*). The government argues these conditions are insufficient because they do not meet the standard of Section 1B1.13 and defendant's conditions are well controlled. (Doc. 73, at 7–14).

Numerous courts have held a defendant's relevant health conditions and the presence of COVID-19 within the BOP generally, or within the defendant's specific facility, together can constitute an extraordinary and compelling reason for compassionate release. *See Burnside*, 2020 WL 3443944, at *7 (compiling cases). The Centers for Disease Control ("CDC") lists nine categories of people who are at higher risk of severe illness and death from COVID-19: (1) people 65 years or older, (2) people living in a long-term care facility, (3) people with chronic lung disease or moderate to severe asthma, (4) people with a serious heart condition, (5) people with a compromised immune system, (6) severely obese people with a body mass index ("BMI") of 40 or above, (7) diabetic people, (8) people with chronic kidney disease undergoing dialysis, and (9) people with liver disease. *People Who Are at Higher Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. The latter seven categories apply to "[p]eople of all ages with underlying conditions, particularly if not well controlled[.]" *Id.*

Defendant at least fits the CDC's category for people with a chronic lung disease. Defendant was diagnosed with COPD several years before 2017. (Doc. 72–8, at 37). He has used an inhaler for at least three years. (Docs. 72–2, at 8; 72–8, at 90). On April 25, 2019, the BOP described defendant's COPD as "stable" but also "severe with positive bronchodilator response" with "severe coexisting obstructive process with improvement after bronchodilator." (Doc. 72–4, at 41–42). Recent records note his

---

[6] COPD "refers to a group of disease that cause airflow blockage and breathing-related problems." *What is COPD?*, CDC, https://www.cdc.gov/copd/index.html.

COPD but not with any emphasis. *See, e.g.*, (Doc. 72–2, at 12, 56). Although it appears defendant had poor air flow in early 2018 and improved but somewhat low air flow when using a bronchodilator in April 2019, recent reports do not mention any air flow issues. (Docs. 72–4, at 43; 72–7, at 38). Defendant also notes he is prescribed Budesonide/Formoterol, which is an immunosuppressant.[7] (Doc. 72, at 12); *see also* (Doc. 72–2, at 8, 80)). Defendant takes this medication for asthma.[8] (*Id.*). Aside from this medicine, nothing in the record suggests defendant is immunocompromised. *See If You Are Immunocompromised, Protect Yourself from COVID-19*, CDC, https://www-.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/immunocompromised.html (noting immunosuppressants lower the body's ability to fight some infections).

Although defendant asserts he is severely obese (Doc. 72, at 13), and he has gained weight while in prison, it appears defendant has lost a substantial amount of weight in recent months. Defendant is 6' 1''. (Docs. 32, at 2; 72–4, at 43). Near the time of sentencing in 2015, defendant weighed 210 lbs. (Doc. 32, at 2). His most recent weight on record was taken on April 25, 2019, at which time he weighed 304 lbs. (Doc. 72–4, at 43); *see also* (*Id.*, at 61) (stating on April 5, 2019, that "[defendant] reports gaining 70# since he arrived at FMC Rochester"). In August 2019, defendant reported "unexplained weight loss." (Doc. 72–3, at 19). On January 2, 2020, defendant was "negative" for weight loss. (Doc. 72–4, at 28–29) (noting also that defendant's BMI could not be calculated because his height and weight were not on file). Defendant's weight is not mentioned again until February 14, 2020, at which time he reported 50 lbs.

---

[7] Generally, immunosuppressants lower the body's immune response so that the body does not reject a transplanted organ. *Kidney and Pancreas Transplant Program*, Columbia Surgery, https://columbiasurgery.org/kidney-transplant/immunosuppressant-medications.

[8] Budesonide can help prevent the symptoms of asthma or proactively lessen the severity of asthma attacks. *Budesonide (Inhalation Route)*, Mayo Clinic, https://www.mayo-clinic.org/drugs-supplements/budesonide-inhalation-route/description/drg-20071233.

9

of intentional weight loss. (Doc. 72–2, at 52). Subtracting 50 lbs. from his last recorded weight of 304 lbs., it appears defendant's current weight is around 254 lbs. Thus, his BMI is approximately 33.5, making him obese but not in the CDC's risk category of persons with a BMI of 40 or above.

Defendant's primary medical concern is his chronic pain. The record overwhelmingly shows defendant has severe chronic pain, particularly in his lower back as well as his knee, shoulder, and neck. (Docs. 72–2, at 59; 72–4, at 104; 72–5, at 7, 11; 72–6, at 84, 117, 127; 72–8, at 13, 32, 46; 72–9, at 28, 33–34; 72–10, at 4, 12). He has consistently described his pain as high and "excruciating." *See, e.g.*, (Docs. 72–6, at 117; 72–8, at 13). Although defendant will only be 45 years old next month, he uses a seated walker. (Docs. 72–2, at 67; 72–3, at 48; 72–4, at 43). He suffers from advanced disc degeneration and disc space height loss at two points in his spine as well as chronic coccydynia, i.e. pain in his tailbone. (Doc. 72–6, at 25). Attempts to manage his pain have been unsuccessful. (Doc. 72–2, at 24, 53). On March 23, 2020, he described his pain as "unbearable." (*Id.*, at 29). The BOP's list of defendant's pain reports is extensive. (*Id.*, at 26). Defendant's pain prevents him from sleeping or defecating comfortably. (Doc. 72–8, at 12–13). As a result, defendant is labelled as Care Level 3 due to his "unstable, complex chronic care." (Doc. 72–13, at 2).[9]

Defendant's health conditions are concerning. As discussed, the Court finds Section 1B1.13 to be helpful but not conclusive. COPD is itself a high-risk factor during the pandemic. *See, e.g.*, *United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732, at *2 (D. Conn. Apr. 8, 2020) (granting release based on COPD, asthma,

---

[9] "Care Level 3 inmates are outpatients who have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition[.]" *Care Level Classifications for Medical and Mental Health Conditions or Disabilities*, BOP, https://www.bop.gov/resources/pdfs/care-_level_classification_guide.pdf, (May 2019).

and other respiratory illnesses at age 65). Although defendant's breathing seriously declined in the past, recent reports do not reflect that his COPD is particularly serious at this time. His COPD is compounded, however, by his sleep apnea which preexisted his term of incarceration. (Doc. 32, at 28). It appears defendant has recently lost a significant amount of weight, but his obesity still presents a notable health concern. Based on the record, his most substantial health issue is his chronic pain which does not appear to fit into any of the CDC's risk categories for COVID-19. Whereas his other health conditions appear to have stabilized, defendant has found little respite from his chronic pain. Given the sheer severity and persistence of such pain along with defendant's respiratory issues, the Court finds defendant has medical conditions which, in combination, significantly increase his susceptibility to COVID-19. *See United States v. Baclaan*, CR. NO. 16-00468 HG-01, 2020 WL 2820199, at *4–5 (D. Haw. May 29, 2020) (granting release to a 62 year-old defendant with chronic pain from a prior injury, asthma, coronary artery disease, sleep apnea, diabetes, hypertension, degenerative disc disease, and radiculitis); *United States v. Kubinski*, No. 3:93-CR-28-1H, 2020 WL 2475859, at *4–5 (E.D.N.C. May 13, 2020) (granting release to a 72 year-old defendant due to aging with symptoms such as chronic pain, heart spasms during sleep, blood in his urine, loss of hearing, loss of vision, and hypertension); *United States v. Gutierrez*, No. 5:11-CR-149-1-BR, 2020 U.S. Dist. LEXIS 76137, at *7, *10 (D.N.C. Apr. 30, 2020) (granting release to a 45 year-old defendant with chronic pain, chronic myeloid leukemia, diabetes, hyperlipidemia, morbid obesity, anemia, hypertension, sleep-related bruxism, and polyneuropathy).

Defendant's health issues alone, however, are not sufficient. The Court must also evaluate to what extent defendant is at risk of exposure to COVID-19 at his particular BOP facility or within the BOP generally. Currently, there are no cases of COVID-19

at FMC Rochester.  *See COVID-19*, BOP, https://www.bop.gov/coronavirus/.[10]  The low risk defendant faces in his own facility at this time weighs against release.  Although the BOP's efforts have spared FMC Rochester thus far, COVID-19 has spread throughout other facilities.  Despite the BOP's commendable efforts to prevent transmission among its inmates,[11] there is only so much that can be done to stymie the virus.  On May 1, 2020, the BOP reported it had tested 2,700 out 146,000 inmates for COVID-19, with 70 percent testing positive.  BOP, Twitter, (May 1, 2020, 8:03 AM), https://twitter.com/Official-FBOP/status/1256207531820662785.  On May 29, 2020, the BOP stated a total of 1,577 persons in federal custody and 181 staff had active COVID-19 cases and 3,180 inmates and 413 staff had recovered.  BOP, Twitter, (May 29, 2020, 7:27 AM), https://twitter.com/OfficialFBOP/status/126634551-4913738752.  Thus, COVID-19's spread is simply a reality and not a condemnation of the BOP's efforts.

The Court has carefully considered the significant risk this defendant faces against the likelihood of his exposure to COVID-19.  This is a close case.  On one hand, defendant's most significant medical issue, his chronic pain, does not itself raise his susceptibility to COVID-19.  His chronic pain, however, is severe and accompanied by other medical conditions, particularly his COPD and sleep apnea, which do increase his

---

[10] Defendant asserts FMC Rochester has one case of COVID-19.  (Doc. 72, at 13).  Defendant may be referring to a staff member at FMC Rochester who tested positive for COVID-19 in early May 2020.  That employee, however, had not been at FMC Rochester since mid-April 2020 and, thus, it appears never transmitted the virus into the facility.  *FMC Employee with COVID-19 Has Not Been at Facility Since Mid-April*, Post Bulletin, https://www.postbulletin.com/newsmd/coronavirus/6477928-FMC-employee-with-COVID-19-has-not-been-at-facility-since-mid-April, (May 5, 2020).

[11] The BOP's measures include limiting inmate movement, suspending visits, suspending staff training and travel, screening staff and inmates for COVID-19 symptoms, and modifying operations to maximum social distancing to the extent possible.  *BOP Implementing Modified Operations*, BOP, https://www.bop.gov/-coronavirus-/covid19_status.jsp.

risk of complications from COVID-19. Given his medical conditions, defendant would be in significantly greater jeopardy than the average inmate in the probable event of a COVID-19 flare-up at FMC Rochester. Thus, the Court finds defendant has presented an extraordinary and compelling reason for release, albeit marginally.

### C. Section 3553(a) Factors and Danger to Community

Guideline Section 1B1.13(2) provides compassionate release is appropriate only where "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section 3582(c)(1)(A) requires a court to consider the factors set forth in Title 18, United States Code, Section 3553(a) before granting compassionate release. Section 3553(a) requires the Court to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide rehabilitative opportunities and care to the defendant; (3) the kinds of sentences available; (4) the sentencing range as set by the USSG; (5) any pertinent policy by the United States Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need for restitution to any victims.

The 3553(a) factors weigh against release. In his original request for release to FMC Rochester's warden, defendant described himself as a "non-violent low level drug offender who has a very small criminal history." (Doc. 72–1, at 2). That statement was at best inaccurate. Defendant attempted to operate a store that sold controlled substances and analogue controlled substances. He was found in possession of various controlled substances on multiple occasions in the instant offense alone. He was also often found in possession of drug paraphernalia and cash. He trafficked in at least 5,402.7 grams of synthetic cannabinoids. He did this despite knowing he was severely addicted to multiple controlled substances. His multiple addictions span years, including long periods when

13

defendant used multiple substances daily. He failed to complete drug treatment around a dozen times. He also stole the identity of someone he knew to be a real person, apparently as part of some scheme with that person's ex-wife. (Doc. 32, at 13). His criminal history spans his entire adult life and includes crimes of violence, multiple prior drug offenses, and at least six violations while on probation. (*Id.*, at 17–18, 21). Defendant was not deterred by prior punishments or the multiple interactions he had with law enforcement officers throughout his offense conduct here.

Some mitigating factors are present. Defendant was introduced to drugs and alcohol at a young age. He had a reliable work history. He has also completed an impressive number of classes while incarcerated and had only one disciplinary report, albeit for an assault on another inmate in 2016. (Docs. 72–12 & 72–13). The Court also has sympathy for defendant's and his father's medical conditions. *See* (Docs. 72–1, at 2; 72–14). These mitigating factors, however, do not outweigh defendant's aggravating offense and criminal history. Although defendant has served approximately three quarters of his sentence, the Court finds the remainder of defendant's sentence is necessary to deter him and others similarly situated as well as to provide just punishment, promote respect for the law, and protect the public.

Weighing all the factors under Title 18, United States Code, Section 3553(a), the Court finds compassionate release is inappropriate and therefore denies defendant's motion. Although defendant faces greater risk than the average inmate from the COVID-19 pandemic, and although that risk could likely be mitigated if the Court released him early from prison, defendant's history shows he presents a danger to the community such that the Court finds early release unjustified.

## V.     CONCLUSION

For these reasons, defendant's Motion for Compassionate Release is **denied**. (Doc. 71).  Defendant must serve the remainder of his term of incarceration as previously directed.  (Doc. 39).

**IT IS SO ORDERED** this 29th day of June, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa